UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALVIN FLORIDA JR., ROBERT ALHASHASH RASHEED, REFUGIO DIAZ, and JOHN LEE BERRY III,<br><br>Defendants. | Case No. 4:14-cr-00582-JD<br><br>**ORDER RE MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL**<br><br>Re: Dkt. Nos. 410, 412, 413 |

On December 15, 2016, a jury convicted defendants Alvin Florida Jr., Robert Rasheed, Refugio Diaz, and John Lee Berry III, of bid rigging in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Rasheed, Diaz and Berry seek in these motions a judgment of acquittal under Federal Rules of Criminal Procedure Rule 29 or alternatively a new trial under Rule 33. Florida's post-trial motions will be addressed in a separate proceeding for scheduling reasons. The motions are denied.

## BACKGROUND

Defendants were indicted in November 2014 under the Sherman Act and for mail fraud under 18 U.S.C § 1341. The indictments arose out of investigations across the Bay Area for alleged bid rigging in public foreclosure auctions. The government's antitrust theory here, in a nutshell, was that defendants conspired from May 2008 through December 2010 to rig the bidding for residential properties at foreclosure auctions in Alameda County. Defendants would allow a co-conspirator to win the public auction at a low price by not bidding against him, and would then hold, on the steps of the Alameda County Superior Court, a nonpublic second auction or "round" in which the conspirators would bid among themselves for the rights to the foreclosed property.

This was defendants' second trial on the Sherman Act charge. A prior trial before Chief Judge Phyllis J. Hamilton ended in a hung jury, and this Court handled the second trial to accommodate judicial and attorney scheduling issues.

The mail fraud count was dismissed and trial started on December 5, 2016, on the bid rigging charge only. Defendants moved for acquittal under Rule 29(a) after the government rested, which the Court denied because there was "more than enough evidence for a rational trier of fact, or a jury, to convict each of the defendants on all of the elements beyond a reasonable doubt." Dkt. No. 306 at 1053:9-13. The jury began deliberations on December 13, 2016, and returned guilty verdicts for each defendant two days later. Dkt. Nos. 387-90.

Defendants filed the Rule 29 and Rule 33 motions pursuant to a stipulated briefing schedule. Dkt. No. 401 (stipulation); Dkt. No. 410 (Diaz motion); Dkt. No. 412 (Rasheed motion); Dkt. No. 413 (Berry motion). Rasheed and Berry cross-joined all of the motions. Dkt. No. 412 at 2; Dkt. No. 413 at 1. Diaz did not expressly join the other motions, but for clarity and full coverage of the issues, the Court will treat all of the arguments in the motions as if raised by each defendant here.

## DISCUSSION

### I.     STANDARDS

The governing standards for the motions are straightforward. Under Rule 29, a defendant may move for a judgment of acquittal, or renew such a motion, after a jury returns a guilty verdict. Fed R. Crim. P. 29(c)(2). The determinative inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The Court does not weigh witness credibility when ruling on a Rule 29 motion. *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). Instead, "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *Id.* (internal quotation omitted).

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When evaluating a Rule 33 motion, the Court need

1  not view the evidence in the light most favorable to the prosecution, and may weigh the evidence
2  and evaluate the credibility of the witnesses. *United States v. Kellington*, 217 F.3d 1084, 1097
3  (9th Cir. 2000). If the Court concludes that, "despite the abstract sufficiency of the evidence to
4  sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a
5  serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial,
6  and submit the issues for determination by another jury." *Id*. (internal quotation omitted).

## II.   DEFENDANTS' CONTENTIONS

Defendants offer the same arguments for Rule 29 and Rule 33 purposes, with no distinctions or differences. The Court resolves the motions in the same fashion.

As a prefatory matter, defendants face a steep climb in challenging the overall sufficiency of the evidence and the soundness of the verdict. The trial featured substantial evidence from cooperating witnesses who had personally participated in the bid rigging scheme, an undercover FBI agent who infiltrated the conspiracy and worked with the defendants at the auctions, audio and video evidence that captured the defendants' own speech and conduct, and documents prepared by the defendants as business records for the conspiracy. The evidence was direct and consistent in material part across the witnesses. This was not a trial where weak facts were served in small portions.

### A.   Conspiracy Variance

Defendants raise several specific contentions for acquittal or a new trial. To start, they argue that the evidence failed to prove the "single overall conspiracy" charged in the indictment, and instead "at best, showed multiple distinct agreements to rig bids limited in time and events to specific properties occurring at separate auctions conducted on different dates involving revolving bidders." Dkt. No. 412 at 6.

This argument is unavailing. The evidence at trial amply established "one overall agreement" of conspiracy. *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980) (internal quotation omitted). To be sure, defendants did not behave in absolute lockstep at every moment over the course of two and a half years of bid rigging. On some occasions, defendants handled specific bids or rounds in smaller configurations. But those minor variations did not fatally

3

undermine the proof of a single conspiracy. What matters is whether the evidence showed consistency in "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984).

On all of these points, the trial record is substantial and solidly supports the existence of a single conspiracy. The uncontroverted facts showed that, over the life of the conspiracy, defendants had a shared understanding of the rules of the scheme, and engaged in common conduct to realize its goals. Among other things, the evidence established that defendants agreed not to competitively bid at public auctions and instead to allow a single conspirator to win the auction. *See, e.g.,* Dkt. No. 392 at 252:15-253:9; Dkt. No. 393 at 465:12-466:3; Dkt. No. 394 at 612:15-614:4; Dkt. No. 395 at 750:16-752:7; Dkt. No. 396 at 955:3-11. They agreed that the winning conspirator would take the property to a nonpublic round for rebidding, where the conspirator willing to pay the most for the property would get the property and the other conspirators would receive payoffs. *See, e.g.,* Dkt. No. 392 at 254:2-255:16; Dkt. No. 394 at 614:13-621:19; Dkt. No. 395 at 754:9-11. The central actors in the scheme -- defendants Florida, Rasheed, Berry, and Diaz -- remained consistent. *See, e.g.,* Dkt. No. 393 at 472:1-473:16, 492:6-13; Dkt. No. 394 at 624:5-627:19; Dkt. No. 395 at 745:18-747:5, 819:17-820:5. And all of this was done for the shared purpose of making money from the rigged bids. *See, e.g.,* Dkt. No. 393 at 521:22-522:3; Dkt. No. 394 at 614:5-8. This is enough to overcome defendants' variance challenge.

### B. The Criers

Defendants contend that "no bid rigging occurred" because the auctioneers or "criers" effectively served as agents for the banks at the auctions and "readily swapped cashier checks from the winners of the rounds for the cashier checks submitted [by] the winner of the public auction." Dkt. No. 412 at 7. While defendants' theory here is somewhat opaque, the point appears to be that by swapping the checks the criers "served to sanction the round" and thereby protect a bank or other party's interests from harm. *Id*. at 7-8.

This contention fails for two reasons.  As an initial matter, it rehashes an argument that Chief Judge Hamilton rejected before the original trial.  In a pretrial order, the court held that "evidence that the auctioneers, trustee companies or banks were negligent in preventing the anticompetitive conduct, or even acquiescent, is not relevant to the bid-rigging charge."  Dkt. No. 284 at 4-5.  Defendants' attempt to resurrect this settled issue is tantamount to a motion for reconsideration that fails to satisfy any of the requirements that might warrant another look.  *See* Civil Local Rule 7-9.[1]

But even if reconsideration were appropriate, which is not the case, the Court has no doubt that the original ruling is sound.  This is so because bid rigging is a *per se* violation of the Sherman Act.  *United States v. Green*, 592 F.3d 1057, 1068 (9th Cir. 2010).  As a *per se* violation, "further examination of the challenged conduct" and surrounding circumstances is unjustified. *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 290 (1985) (internal quotation omitted).  Consequently, any purported role or function of the criers as agents or otherwise is immaterial to defendants' liability.  For the same reason, defendants' complaint that they were denied an opportunity to explore the "scope and nature of the criers' acts" at trial is of no moment.  Dkt. No. 412 at 9.  That evidence was irrelevant and would only have misled the jury and confused the issues.

**C.     Interstate Commerce**

Defendants say that the evidence failed to show that the conspiracy involved transactions in the flow of interstate commerce.  Dkt. No. 412 at 8.  They contend that the cashier's checks defendants gave to the criers were deposited in California banks, which is "the point where their movement was intended to end."  *Id.*

This contention misapprehends the trial record.  The evidence amply demonstrated that defendants' purchase payments eventually made their way across state lines to financial institutions outside California.  For example, one of the rigged bids involved a residence at 3058 Berlin Way in Oakland, California.  *See* Dkt. No. 392 at 273:4-7; *id.* at 279:17-18.  After the

---

[1] This rule applies pursuant to Criminal Local Rule 2-1.

1  designated participant in the scheme won the public auction for that property, he gave a purchase
2  money check in the amount of $158,000 to the crier, who in turn mailed it to a trustee in
3  California, the California Reconveyance Company ("CRC"). *Id.* at 174:12-13. CRC then sent a
4  check for $158,000 to the Berlin Way property's note holder, JP Morgan Chase Bank, in Ohio. *Id.*
5  at 173:16-22, 174:8-16, 176:25-177:1. Other transactions involving rigged bids showed the same
6  flow of funds from defendants to final destinations outside California. *See*, *e.g.*, Dkt. No. 392 at
7  172:2-15, 178:14-19. This was substantial evidence that the funds defendants tendered for the
8  affected properties entered the flow of interstate commerce. It also puts to rest defendants' claim
9  that no witness "conclusively" testified that any checks entered the flow of interstate commerce.
10 Dkt. No. 412 at 8.

11 A transitory pass through a California bank account before being sent out of state "does not
12 necessarily mean that the funds are no longer in commerce -- where there is a practical continuity
13 of movement, funds remain in commerce until they reach their final destination." *United States v.*
14 *Guthrie*, 814 F. Supp. 942, 946 (E.D. Wash. 1993), *aff'd mem.*, 17 F.3d 397 (9th Cir. 1994).
15 Amended Final Jury Instruction No. 15 in this case, which defendants did not object to,
16 incorporated this concept and advised the jury that "Funds in interstate commerce are considered
17 in commerce until they reach the point where their movement is intended to end. A temporary
18 pause in their transit does not necessarily mean that the funds are no longer in commerce – where
19 there is a practical continuity of movement, funds remain in commerce until they reach their final
20 destination." Dkt. No. 386 at 16. Defendants have shown no evidentiary insufficiency on the
21 interstate commerce element.

22 **D.    *Brady* Issues**

23 Defendants make a cursory claim that the prosecution violated *Brady v. Maryland*, 373
24 U.S. 83 (1963), by failing to disclose that two accused cooperators in another auction
25 investigation, Thia and a different Diaz than the defendant here, were apparently allowed to retain
26 property from certain auction transactions done in conjunction with the FBI. Dkt. No. 412 at 9-10.
27 Defendants do not cite any case law at all for this argument, let alone a decision supporting the
28 possibility of a *Brady* violation in this specific situation. Moreover, they do not explain how this

6

point was potentially exculpatory or otherwise favorable to them, or even relevant. Neither Diaz nor Thia testified in this trial. And despite their absence, defense counsel devoted considerable attention to them during cross-examination of the government's witnesses and in closing arguments. *See, e.g.,* Dkt. No. 393 at 383:21-384:3, 388:21-25, 393:22-23; Dkt. No. 397 at 1161:1-20, 1180:23-1181:24. They certainly were not prejudiced in presenting the issue to the jury.

### E.  Miscellaneous Points

Defendants raise a number of other points in short-form arguments. They say the prosecution violated a pretrial order by telling the jury that defendants exploited homeowners during the financial crisis. Dkt. No. 412 at 10-11. That is an overreach. The pretrial order barred the prosecution from using the word "victim," which the prosecution did not use at trial, and that restriction was only in connection with auctioneers, trustees, and beneficiaries -- not homeowners. Dkt. No. 284 at 5; *see also* Dkt. No. 283 at 18; Dkt. No. 261 at 3.

Defendants contend that Jury Instruction No. 16 -- which instructed the jury that bid rigging is *per se* illegal under the Sherman Act -- was unnecessary, irrelevant, and "likely reduced the government's burden from reasonable doubt as to each element to a simple *per se* automatic finding of guilt." Dkt. No. 412 at 11. This again rehashes an issue resolved by a pretrial order and is unavailing for the reasons discussed above about the *per se* nature of the Sherman Act violation.

Diaz makes the argument that his conviction should not stand because the only witnesses who mentioned him were cooperating witnesses whose testimony "should have been viewed with suspicion." Dkt. No. 410 at 6. This contention is misdirected. To the extent Diaz urges that a cooperating witness testifying under the terms of a plea agreement is automatically not credible, he advances a novel proposition that lacks any support in the case law. His reliance on *Lyda v. United States,* 321 F.2d 788 (9th Cir. 1963), is misplaced. *Lyda* involved a conviction based largely on the testimony of one accomplice who had made inconsistent statements before and during trial, and whose version of events was "somewhat bizarre." *Id*. at 794. Even in that situation, the Ninth Circuit held that the witness was not so "shoddy" as to warrant acquittal. *Id*. at 794-95; *see also United States v. Tam*, 240 F.3d 797, 806 (9th Cir. 2001) (citing *Lyda* to hold that

United States District Court
Northern District of California

1   conviction may be based on uncorroborated testimony of a single accomplice so long as a "level of
2   shoddiness" has not been reached).

3       The circumstances here are a far cry from *Lyda*. Several witnesses testified about Diaz's
4   involvement in the conspiracy, *see, e.g.*, Dkt. No. 393 at 492:6-16; Dkt. No. 394 at 625:24-626:23;
5   Dkt. No. 395 at 746:9-25, and documentary evidence in the form of round sheets for the nonpublic
6   second bids listed Diaz 65 times. *See* Dkt. No. 396 at 1018:11-1019:9. His conviction did not
7   turn on the word of a single "shoddy" accomplice.

8       If Diaz is arguing the less extreme position that cooperating witness testimony should be
9   viewed skeptically, the jury got that message loud and clear. Defense counsel were relentless in
10  attacking the cooperating witnesses' credibility and motivations during cross-examination, *see,*
11  *e.g.,* Dkt. No. 394 at 536:2-543:18; Dkt. No. 395 at 701:4-703:13, 773:14-781:12, 855:20-867:4;
12  Dkt. No. 396 at 995:10-999:2, and in closing argument, Dkt. No. 397 at 1149:5-1156:23, 1181:25-
13  1183:9, 1192:25-1193:15, 1201:10-1205:18, 1215:13-1218:14. These attacks were one of
14  defendants' main themes throughout the trial and the jury was forcefully apprised of defendants'
15  skepticism about the testimony. The jury was also advised in Amended Final Jury Instruction No.
16  21 to view testimony by cooperating witnesses "with greater caution than that of other witnesses."
17  Dkt. No. 386 at 22.

18      Consequently, Diaz's argument about cooperating witnesses is not well taken. Weighing
19  their credibility was entrusted to the jury, and the Court will not second-guess that on a Rule 29
20  motion. *Alarcon-Simi*, 300 F.3d at 1176. Based on the totality of the evidence, and on its overall
21  impressions about the witnesses from seeing and hearing them at trial, the Court also declines to
22  disregard the testimony for Rule 33 purposes.

23      Diaz takes issue with the Court's request to his counsel to move along during closing
24  argument. This, too, is not grounds for acquittal or a new trial. Diaz's lawyer was the last of four
25  defense counsel to argue in closing, and by the time he took the floor, the jury had already heard
26  approximately two hours of argument by the other defense counsel. Diaz's attorney added another
27  35 minutes of argument that repeated themes and points already raised by the other defense
28  lawyers. Only at that point did the Court briefly comment to request that he turn to the "good

stuff," as counsel characterized it. Dkt. No. 397 at 1227:7-12. This was an appropriate exercise of the Court's broad discretion over the duration and scope of closing argument. *See Herring v. New York*, 422 U.S. 853, 862 (1975). Diaz's counsel was not denied an opportunity to make an argument and did not have his time curtailed in any way. Nor was he singled out for attention. The Court also cautioned the prosecution during its closing arguments. *See* Dkt. No. 397 at 1232:21-1233:7.

## CONCLUSION

The Rule 29 and Rule 33 motions are denied.

**IT IS SO ORDERED.**

Dated: March 6, 2017

JAMES DONATO
United States District Judge